Israel G. Torres (#020303)
James E. Barton, II (#023888)
Saman J. Golestan (#031710)
TORRES LAW GROUP, PLLC
2239 West Baseline Road
Tempe, Arizona 85283
480.588.6120
James@TheTorresFirm.com
Saman@TheTorresFirm.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JAMES ROGERS, an individual<br><br>Plaintiff,<br><br>**vs.**<br><br>MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, a political subdivision of Arizona; MARIA WISE, an individual; AND VIVIAN MIRANDA-STRAWBRIDGE, an individual<br><br>Defendant | Case No.<br><br>**COMPLAINT** |

## INTRODUCTION

This complaint is a civil action under the Americans with Disabilities Act of 1990 ("the ADA"), 42, U.S.C. §12132, the Rehabilitation Act of 1973 ("The Rehabilitation Act"), 29 U.S.C. § 794, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2614(a)(1), and Intentional Infliction of Emotional Distress, to enjoin the unlawful discrimination and retaliation against and to provide relief to James Rogers ("J.R."). As alleged in further detail below, Defendant Maricopa

County Community College District, discriminated against J.R., interfered with his FMLA protections and created a working environment so hostile and stressful that he diagnosed with work related PTSD.  The conduct of Defendants Wise and Miranda-Strawbridge also rose to the level of intentional infliction of emotional distress.

**JURISDICTION**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. This action is authorized by and initiated under 42 U.S.C. § 12133, and 29 U.S.C. § 794.

3. The discrimination, retaliation and intentional infliction of emotional distress, alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Arizona.

**PARTIES**

1. James Rogers ("J.R.") is a citizen of the United States of America and a citizen and resident of the State of Arizona.

2. Defendant Maricopa County College District ("MCCCD") is a political subdivision of Arizona.

3. MCCCD is headquartered and operates business in the State of Arizona, county of Maricopa and has continuously has at least 15 employees.

4. Defendant Maria Wise, Ed.D. is, and at all relevant times was, the Vice President of Academic & Student Affairs and Title IX Coordinator of Gateway Community College, a Maricopa Community College.

5. Defendant Vivian Miranda-Strawbridge is, and at all relevant times was, Dean of Student Services & Retention of Gateway Community College, a Maricopa Community College.

6. At all relevant times, Defendant Employer has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

7. At all relevant times, J.R. was an employee of Defendant.

## GENERAL ALLEGTIONS

4. J.R. is a current employee of MCCCD.

5. In his position as a Disability Resources & Services Manager at Gateway Community College (GWCC), J.R. identifies student needs related to disability—through interviews, documentation, and perceived disability—provides mandatory services including issuing accommodations, and serves as an advocate for disabled students.

6. J.R.'s work was met with constant opposition from the administration and faculty.

7. During J.R.'s tenure at GWCC, Dr. Abdul Awad, a Math & Science professor and Dr. Jim Baugh, Department Chair of Math & Science, often challenged J.R. concerning ADA mandated accommodations for students.

8. In one incident, Dr. Awad refused every accommodation a diabetic student in his class requested. He revealed her disability during class and harassed this student. In the spring of 2016 Dr. Awad continuously interfered with the student's testing accommodations.

9. During this period, J.R. continuously advocated for this student to be given the accommodations she was entitled to.

10. Dr. Peter Zawicki, Physical Therapy Program Director, and J.R. had multiple hostile confrontations in both public and private that the administration failed to resolve.

11. These conflicts originated in PTA students J.R. advocated for who were entitled to accommodations after Dr. Zawicki refused them.

12. Dr. Zawicki was also a principle player in the discrimination of a PTA student who filed an OCR complaint.

13. As a result of J.R.'s insistence that accommodations be met Dr. Zawicki was hostile and verbally assaulted J.R. even in public settings.

14. In the beginning of spring 2016 J.R. stood up for a DRS student who was being bullied by Mike Corry and Jim Kenny while participating in the HVAC program. The student was denied his accommodations on multiple occasions and Corry and Kenny refused to even sign the student's accommodation form. They explicitly declared that they would not allow any accommodations in the HVAC classes.

15. J.R. faced open hostility from faculty members Dr. Bryan Dodd, Division Chair, Health Sciences and Margi Schultz, Nursing Division Chair, for advocating for students to receive their required accommodations.

16. Due to his advocacy for students, JR has been in constant conflict with and faced opposition from the Administration and faculty.

17. The Administration failed to resolve these conflicts.

18. In December 2016, contrary to well-established college policy on reviewing student accommodations, a new practice was instituted allowing Dr. Zawicki approve or deny accommodation on every Instructor Notification of disability accommodations as they pertained to any lab class in the Science or Healthcare departments. This statement was a restriction and a denial of accommodations to students with a documented disability.

19. Under then and current district policy,

> In the event the instructor believes the modification determined by DRS would alter an academic requirement that is essential to the instruction being pursued by the student, or to a directly related licensing requirement, the instructor will first meet with the director of the DRS office within three working days of receipt of the determination and attempt to resolve the issue informally. If the

> faculty member's concern remains unresolved, within three days of the above meeting, he or she may submit a written request to the college's chief academic officer (or a comparably qualified administrator designated by the college president) for his or her academic judgment on the question.

MCCCD Policy 2.8.1 Eligibility for Accommodations & Required Disability Documentation, *available at* https://chancellor.maricopa.edu/public-stewardship/governance/administrative-regulations/2-students/2.8-students-with-disabilities/2.8.1-eligibility-for-accommodations-required

20. J.R. objected to this policy because it ignored the limited circumstances in which an accommodation could be altered.

21. On December 13, 2016, V.P. Wise and Dean Miranda-Strawbridge instructed J.R. that it is not within the scope of his job description to advocate for students or to enforce the ADA to the campus community.

22. On February 1, 2017, J.R. met with V.P. Wise and Dean Miranda-Strawbridge to discuss the critical understaffing in DRS, which had risen to the point that it interfered in providing legally required services.

23. This conversation resulted in a new hire, who served only one day before being rejected by the administration.

24. On or about February 2, 2017, J.R. spoke with President Steven Gonzales regarding the retaliation J.R. was experiencing.

25. The President told J.R. he should consider looking for work somewhere else, noting that J.R. "didn't want to end up in court like Michael Corry" and reiterated that neither J.R. nor OCR was the enforcer of ADA compliance on campus.

26. This remark was in conflict with the guidance from District Legal, as expressed by attorney Rebecca Currey.

27. J.R. received reports from three students that their instructor made it clear that the instructor did not like students with disabilities.

-5-

28. Special instructions were issued by instructors Peter Melenovich and Ashley Garneau about how to schedule their exams at the Testing Center with a requirement to e-mail the instructor confirming that they had in fact scheduled at the Testing Center (and not through DRS office). The instructors told the students to follow the process given by the instructors and not those required by the DRS office.

29. The administration reprimanded J.R for advocating for these students.

### Mental and Emotional Attacks Against J.R. in Retaliation

30. J.R. attempted to bring GWCC into compliance as early as January 20, 2016, when he attempted to explain a flexible attendance schedule for a student with an active and documented seizure disorder to a member of the faculty only to be attacked. Dr. Jim Baugh's shouting at J.R. over the phone was loud enough to be overheard by Ms. Tanner, outside J.R.'s office. Zach Rivenbaugh, an IT Tech and Avery Drew an ASU social work intern who were present at the time, each drafted a statement regarding Dr. Baugh's outlandish behavior that was forwarded to the President.

31. Over the objections of Ms. Tanner, Dr. Baugh barged into J.R.'s office claiming he had to "have this out with him right now!" Dr. Baugh's outburst occurred in front of two students and ASU interns.

32. The next day, President Gonzales asked J.R. if he was "going to do anything" about the conflict. When J.R. explained that he would do so if it would end positively, the President replied that the faculty would not change their behavior and acknowledged that J.R. was doing good work with a "tough" job.

33. In March 2016, Susan Mills, Department Chair, Arts & Humanities, Social & Behavioral Sciences, denied J.R. the opportunity to teach a social work class at the college—despite the fact

-6-

that Vince Hoffman had already hired him and that J.R. was the only person with a MSW on campus at the time.

34. The Counseling Chair, Frank Zamora, urged Ms. Mills not to do this. She explained that the faculty "did not like" J.R. because of his role as DRS Manager. This was witnessed by Chris Mins, Dr. Vince Huffman, Donald Hall and Martha Beinert.

35. J.R. suffered a heart attack on March 23, 2016 in response to the public humiliation associated with this incident and the stress of the increasingly hostile environment in his department.

**Removal of Furniture Thereby Interfering with Providing Services to Students**

36. Due to the volume of student needs, the administration, for nearly a year, publicly stated that they would be expanding the physical space of the DRS office. The DRS had no private area to meet with students, and were forced to use public spaces.

37. V.P Wise asked J.R. and Frank Zamora the Counseling Dept. Chair, to choose which department to relocate. Mr. Zamora offered to leave the shared space and drew up remodeling plans for that purpose, ordering new furniture and equipment for Counseling.

38. Beginning January 4, 2017, and continuing throughout the month, Dean Miranda-Strawbridge repeatedly rejected J.R.'s DRS Area Usage proposal which was submitted according to her specific instructions to J.R. This is despite the fact that designing the layout and use of the DRS workspace was well within the purview of J.R.'s position.

39. On January 10, 2017 in likely retaliation for J.R.'s continual advocacy to faithfully execute student accommodations despite faculty and administrative resistance, the Dean ordered that two DRS rooms be cleared of all furniture.

40. On January 12, 2017, VP Tony Asti directed J.R. on how the DRS Dept. should use the office space that had been vacated by the Counseling Dept. Again taking away J.R.'s decision making power and interfering with DRS services to students at GWCC.

41. V.P. Asti directed Ms. Tanner to remove all DRS "things" from the last 3 DRS rooms (IE1208, IE1207, IE1206) because Facilities would be coming early the next morning to remove everything.

42. The administration demonstrated a reckless disregard for three rooms full of $30,000 worth of assistive technology, software, and sensitive files that were moved to an unknown location without sufficient manpower. Instead the task to secure the rooms was given to Ms. Tanner, without any assistance.

43. The next day, with the assistance of two ASU Social Work interns, J.R. and Ms. Tanner removed the highest priority items from the rooms, although this was only after workers present had already begun the refurbishing process.

44. Following the incident V.P. Wise harshly reprimanded J.R. for being in the DRS office instead of employee break-out classes.

45. As a result of the calculated public humiliation of stripping the DRS offices of their furniture, the hostile attacks on J.R.'s efforts to serve the students, and the false claims regarding J.R.'s failure to follow procedures, J.R. suffered a nervous breakdown.

**Restructuring ASU Internship Program**

46. Between February 13, and March 3, 2017 the ASU internship program was restructured.

47. J.R. initiated and managed an ASU Internship program/partnership. J.R. established this program explicitly for DRS and the program participants anticipated working in disability services.

-8-

48. V.P. Wise and Dean Miranda-Strawbridge selected Ruben Saenz, Director of College Student Educational Services to act as Field Supervisor for the ASU Social Work interns.

49. The interns were re-assigned outside of disability services.

50. Before Saenz completed the certification with ASU required to accept the assignment, Dean Miranda-Strawbridge disparaged J.R. repeatedly, alleging that the internship program was mismanaged.

51. On February 15, 2017, a formal internship meeting was held by V.P. Wise, seven ASU social work interns, ASU Social Work Internship Liaison, Tom Haines, Dean Miranda-Strawbridge, and Ms. Tanner. During this meeting Tom Haines announced that the DRS office and the Gateway campus constituted "a hostile and unhealthy learning environment" for their students and that he and his associates at the ASU School of Social Work, intended to "pull the plug" on the partnership.

### Miscellaneous Acts of Hostility

52. On February 6, 2017, Wise and Dean Miranda-Strawbridge demanded that J.R. write up Ms. Tanner for assisting a student, Sara Street, with her grievance complaint with the college in 2016, under the mistaken belief that Tanner was the sole author of the grievance. J.R. recognized that V.P. Wise intended to fire Ms. Tanner for activity protected by the ADA and refused to participate in this illegal activity. He went home sick as a result of the stress associate with the incident.

53. The administration also began to aggressively marginalize J.R.'s role and retaliate against him and the DRS department, after the Street case received the OCR Resolution Agreement. The bullying and hostile working environment it created posed a serious health risk for J.R.

54. On February 13 2017, Dean Miranda-Strawbridge admitted to retaliating against J.R. based on these efforts to bring the department into compliance. In a conversation with Ms.

Tanner, the Dean said that J.R. had "gone over our heads" numerous times; she repeatedly referred to wrong-doing and incorrect information that J.R. allegedly gave Ms. Tanner in order to sway Ms. Tanner into trusting the Dean as the temporarily acting DRS Manager while J.R. was on FMLA.

55. On February 27 2017, the Dean, unsolicited, told Ms. Tanner that J.R.'s health condition was something he had before she came to campus "so it had nothing to do" with the Dean.

56. In this same meeting the Dean directed Ms. Tanner to prepare a comprehensive report listing of all the things that J.R. would have done as Manager but didn't finish because he was on leave.

57. On March 28, 2017, Dean Miranda-Strawbridge maligned J.R. while sitting at the front counter of DRS, claiming that J.R.'s proposed Area Usage Plan and the Axis Camera Install Proposal were rejected because he failed to submit them on time. This contradicts the Dean's previous public admission on February 15, 2017, that the proposal's failure was due to *her* lack of knowledge of the process.

58. During an internship meeting on February 15, 2017, Dean Miranda-Strawbridge confessed that the Proposal's failure was her fault. In a recording of the meeting she sates:

> **Dean Miranda-Strawbridge:** "When a department vacates an area there is a repurposing proposal that must be done. Because I am new here, I had no idea that there was a proposal process; that was my fault that the repurposing proposal did not meet the submittal deadline and that's why that decision was put on hold. That decision [the use of an area] cannot be made until there's a formal process that's satisfied.
>
> **V.P. Wise:** We need to get that finalized and put to the Team.

> **Dean Miranda-Strawbridge:** There are many other areas [departments] on campus that have their eye on that [DRS] space.
>
> **V.P. Wise**: We want the opportunity to plan for the ideal environment and negotiate reasonable repurposing of the space; that's my job. We then will take it to the Executive Team. It goes to Vivian, then to Maria, then to the Team. This [repurposing] goes back a while. I talked to both Frank [Zamora] and J.R. I asked, What's best for both departments? They came back to me that the greater value to DRS was to commingle with Enrollment services. We do have a process in place to develop repurposing an area

59. On April 3, 2017, Ms. Tanner questioned Dean Miranda-Strawbridge what function the newly hired DRS Manager would hold when J.R. returned from FMLA leave. The Dean dismissed the question, claiming that things would "work out" and directed Ms. Tanner to remove J.R.'s personal things from his office and store them in room IE1204, despite the adverse impact this arrangement would have on DRS serving GWCC's disabled students.

60. On April 6, 2017, Dean Miranda-Strawbridge wrote to Ms. Tanner, instructing her to remove J.R.'s personal things from his office.

61. Additionally, the Dean revealed to Ms. Tanner that two DRS offices would be given to another department, stating that DRS is "no different than any other [department] on campus."

62. On April 11, 2017, Dean Miranda-Strawbridge, remarked to Ms. Tanner, that the Dean and VP Wise were "really mad" when J.R. moved his office to the end of the hall, (IE1205) saying that "He shouldn't have done that. We believe he needs to be out here (gesturing to the previous private office location IE1208) so he can see what's going on."

63. On May 5, 2017 Dean Miranda Strawbridge reported to Ms. Tanner that J.R. lied to the Dean by describing a class Ms. Tanner attended at ASU as lasting only five weeks. Although the

-11-

Dean and J.R. had previously discussed Tanner attending classes in meetings before she was hired.

64. On May 9, 2017, Dean Miranda-Strawbridge disparaged J.R. claiming that the DRS Department was "dysfunctional" and rife with student files that have "no documentation." These remarks were made in a public forum in earshot of disability professionals from throughout the district who knew J.R.

65. Furthermore, the Dean blamed J.R. and his staff for GWCC's high number of pending OCR cases, which was also reported to the President of the College. Dean Miranda-Strawbridge falsely accused J.R. of *encouraging* students to file OCR complaints—ironically failing to understand his role in *assisting* students.

66. On May 11, 2017, Dean Miranda-Strawbridge accused J.R., to his subordinate Ms. Tanner, of creating practices that needed improvement, poorly managing DRS services, creating an employment contract with Jessica Galarza that was improperly made, and other general failings.

67. Throughout the period between March 13, 2013 through February 6, 2017, J.R. reported issues involving the matters above and others to Rebecca Currey, MCCCD's Legal, his ADA employee representative Dr. JoAnn Pina, and Catherine Hernandez at Gateway Community College.

68. J.R. has also suffered numerous cardiovascular incidents brought on by the stress caused by the hostile treatment against him by MCCCD faculty and administration. He has been diagnosed with work-related PTSD.

**FIRST CLAIM FOR RELIEF**

**ADA & Rehabilitation Act Retaliation**

69. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

-12-

70. The first claim for relief is against MCCCD defendant only.

71. Under the Americans with Disabilities Act, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

72. Additionally, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

73. The shouting, physical threats, public humiliation and adverse employment actions that J.R. endured were in response to his having "aided or encouraged any other individual in the exercise of any right granted or protected by [the ADA]."

74. These actions also constitute retaliation under Section 504 of the Rehabilitation Act.

75. As a direct result of the retaliation against J.R., he lost the ability to be engaged in his life's work and is currently on long-term disability with little hope of returning to work..

## SECOND CLAIM FOR RELIEF

### Intentional Inflictions of Emotional Distress

76. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

77. The second claim for relief is against all defendants.

78. Intentional Infliction of Emotional Distress (IIED) requires (1) extreme and outrageous conduct by the defendant, (2) the defendant must either intend to cause emotional distress or do so with reckless disregard to the near certainty that such distress with result from the conduct, and (3) severe emotional distress indeed results from the defendant's conduct. An employer is liable

for failing to investigate and respond to conduct satisfying these elements. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987)

79. J.R. endured shouting, physical threats and public humiliations that reach a level of extreme and outrageous conduct to satisfy an IIED claim.

80. The actions of V.P. Wise and the Dean, particularly the personal attacks against J.R., the forcible relocation of his office, and the refusal to allow him to teach his class, were so offensive and harmful that they ultimately resulted in J.R.'s cardiovascular incidents and PTSD.

81. The individual actions taken by V.P. Wise and the Dean hold them liable for J.R.'s emotional distress.

82. The administration knew or should have known of the harassment V.P. Wise and the Dean inflicted on J.R.

83. Respondeat superior holds an employer vicariously liable for the actions of its employees when those employees are acting within the scope of their employment. *Engler v. Gulf Interstate Engineering, Inc.*

84. V.P. Wise and the Dean were acting within the scope of their employment during the relocation of J.R.'s office and through their hostile actions disguised as work-related comments.

85. These actions occurred during V.P. Wise and the Dean's working hours, within their typical managerial duties and were ostensibly in furtherance of the Employer's interest in their positions as Vice President of Academic & Student Affairs and Title IX Coordinator, and Dean of Student Services & Retention, respectively.

86. J.R. notified MCCCD of the harassment he was experiencing through his reporting of the various incidents to President Steven Gonzales, on January 21, 2016 and again on February 2, 2016.

87. MCCCD failed to respond to the bullying and harassment inflicted upon J.R. even after he reported the abuse to President Gonzales.

88. Therefore under respondeat superior, MCCCD is vicariously liable for the intentional emotional distress they inflicted on J.R. through their employees actions and personally liable through their failure to respond to the harassment after J.R. reported it to the administration.

89. The administration knew or should have known that such distress would result from the harassment he endured at the hands of V.P. Wise and the Dean.

90. Additionally the administration knew or should have known that MCCCD's own failure to respond to that harassment would result in emotional distress.

91. To the extent the actions of V.P. Wise and the Dean were outside the scope of their employment, they, in their personal capacity, knew or should have known that such emotional distress would result from the harassment J.R. endured at their hands.

92. As a direct result of Defendants' Intentional Infliction of Emotional Distress, J.R. has experienced several cardiac events and emotional episodes, as well as diagnosed PTSD that severely interferes with his ability to return to work.

**THIRD CLAIM FOR RELIEF**

**Interference with FMLA/Failure to Provide ADA Accommodation**

93. Plaintiff incorporates the allegations set forth above as though fully set forth herein.

94. The third claim for relief is against MCCCD defendant only.

95. J.R. was out on FMLA leave and was entitled to return to the same or an equivalent position as the one he held before taking the leave. 29 U.S.C. § 2614(a)(1).

96. Under FMLA, it is unlawful for an employer to interfere with, restrain or deny the exercise of any rights given under FMLA.

97. The District hired a new DRS Manager, and cleared out J.R.'s office which made it functionally impossible for him to work.

98. In the alternative, MCCCD has failed to accommodate J.R.'s disability created by the work-related PTSD triggered by MCCCD's actions.

99. J.R. has provided District Legal with a list of alternative jobs that he would be willing to work that would be possible in light of his PTSD, but MCCCD has failed to accept these suggestions or find any alternative other than J.R.'s returning to the very job, supervised by the perpetrators of the acts against him.

100. These actions taken by the District interfered with J.R.'s rights protected under the FMLA.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A. Grant a permanent injunction enjoining Defendant its officers agents, servants, employees, attorneys and all persons in active concert or participation with it, for retaliation for opposing discriminatory practices.

B. Order Defendant to make whole James Rogers, by providing him appropriate compensatory damage payments in amounts to be determined at trial and other affirmative relief necessary to eradicate the effects of its unlawful practices complained above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

C. An order awarding Plaintiff costs and attorneys' and

D. Such other and further relief as may be appropriate.

Dated this 22nd of February, 2018

1

2  _____                    \_/s/ James E. Barton II_____
   _____                    James E. Barton II
3                                      Torres Law Group, PLLC
                                       2239 W. Baseline Road
4                                      Tempe AZ, 85283
5                                      *Attorney for Plaintiff*